UNITED STATES of America, Plaintiff,

v.

COUNTRY LAKE FOODS, INC., Superior–Dairy Fresh Milk Co., Penny C. Van Beek, individually and as co-personal representative of the Estate of Philip E. Peteler, Deceased, First Bank National Association, co-personal representative of the Estate of Philip E. Peteler, Deceased, Georgene H. Peteler, Lynn Rudersdorf, Thomas D. Campbell, Sr., and Diane Campbell, Defendants.

Civ. No. 3–90–101.

United States District Court,
D. Minnesota,
Third Division.

June 1, 1990.

Edmund Round, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

Michael E. Bress and Craig D. Diviney, Dorsey & Whitney, Minneapolis, Minn., for Country Lake Foods, Inc.

Donald R. Backstrom, Rider, Bennett, Egan & Arundel, Minneapolis, Minn., for other defendants.

## FINDINGS OF FACT

RENNER, District Judge.

1. This action is instituted under, and this Court's jurisdiction is based upon, Section 15 of the Clayton Act, 15 U.S.C. § 25, providing for injunctive and other relief for violations of Section 7 of the Clayton Act, 15 U.S.C. § 18.

2. Defendant Country Lake Foods, Inc. ("Country Lake") is a Delaware corporation with its principal place of business in St. Paul, Minnesota. Country Lake is a fluid milk processor with three divisions operating five fluid milk plants in Minnesota, North Dakota and South Dakota. One of those divisions—the Norris Division—operates a processing plant in Woodbury, Minnesota, a suburb of St. Paul.

3. Defendant Superior–Dairy Fresh Milk Co. ("Superior") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Superior is a fluid milk processor with one plant in Minneapolis.

4. Defendant First Bank National Association is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. First Bank is co-representative of the Estate of Philip E. Peteler. The estate of Philip E. Peteler owns approximately 48 percent of Superior's capital stock.

5. Defendant Penny C. Van Beck is a resident of Minnesota. She owns approximately nine percent of Superior's capital stock. She also is a co-representative of the Estate of Philip E. Peteler.

6. Defendant Georgene H. Peteler is a resident of Minnesota. She owns approximately 31 percent of Superior's capital stock.

7. Defendant Lynn Rudersdorf is a resident of Minnesota. She owns approximately nine percent of Superior's capital stock.

8. Defendants Thomas Campbell and Diane Campbell are residents of Minnesota. They jointly own approximately two percent of Superior's capital stock.

9. On November 15, 1989, Country Lake entered into a purchase and sale agreement to acquire all of the outstanding capital stock of Superior. According to the purchase and sale agreement, this transaction ("the proposed acquisition") was to close on February 24, 1990.

10. On February 22, 1990, plaintiff United States of America ("the government") commenced the present action to enjoin the proposed acquisition. The government requests that this Court adjudge the proposed acquisition to be in violation of Section 7 of the Clayton Act and to issue a permanent injunction to restrain the execution of the purchase and sale agreement. The government further requests the Court to issue a preliminary injunction to restrain Country Lake from taking any further action to acquire Superior. Without objection by any defendant,

the government's request for a temporary restraining order was granted on February 22, 1990.

11. The complaint alleges that the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, because it may substantially lessen competition in the relevant product and geographic markets. The complaint alleges the relevant product market consists of the sale of fluid milk and defines the relevant geographic market as the Minneapolis–St. Paul Metropolitan Statistical Area ("MSP/MSA").

12. From March 26, 1990 to March 30, 1990, this Court conducted a hearing with respect to the government's motion for preliminary relief.

13. The fluid milk industry is composed of fluid milk processors who purchase raw milk from dairy farmers and agricultural cooperatives, pasteurize and package it, and then sell the processed product known in the industry as fluid milk. The primary customers of milk processors are grocery stores (including convenience stores), restaurants and institutions such as schools, hospitals and public facilities.

14. The products of fluid milk processors include white homogenized whole milk, white reduced fat milk (two-percent, one-percent and skim), sweet acidophilus milk, chocolate whole and skim milk, buttermilk, and half-and-half. Other dairy products such as sour cream, yogurt, dips and whipping cream, which have longer shelf lives than fluid milk, are not considered part of the fluid milk market.

15. Milk processors located in Minnesota ship and sell substantial quantities of fluid milk across state lines to locations outside Minnesota. The processing and sale of fluid milk is within the flow of and substantially affects interstate commerce. At all times relevant herein, Country Lake and Superior were engaged in commerce as "commerce" is defined in the Clayton Act.

16. The sale of raw milk is regulated by the United States Department of Agriculture ("USDA") under Federal Milk Marketing Orders covering most areas of raw milk production in the United States. The sale of raw milk produced in most of Minnesota (excluding four southwestern counties but including the entire MSP/MSA), and parts of Wisconsin, North Dakota, South Dakota, and Iowa is regulated under Federal Order No. 68 of the Upper Midwest Marketing Area, 7 C.F.R. § 1068.2 (1989). Minimum prices for the sale of milk produced in the Upper Midwest Marketing Area are established by Federal Order No. 68. Country Lake purchases raw milk for processing at its Norris Division plant pursuant to Federal Order No. 68 of the Upper Midwest Marketing Area. Superior also purchases its raw milk pursuant to Federal Order No. 68.

17. The minimum raw milk price established for the Upper Midwest Marketing Area is the lowest USDA minimum price in the United States.

18. Fluid milk is a product that has special nutritional characteristics and is without practical substitutes. There is no reasonable substitute to which a significant number of customers would turn in response to a small but significant and nontransitory increase in the price of fluid milk.

19. The sale of fluid milk constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

20. For purposes of the motion for preliminary injunction, the defendants accept the government's definition of the relevant product market as the sale of fluid milk.

21. The government asserts that the relevant geographical market for the purpose of Section 7 of the Clayton Act is the MSP/MSA, consisting of the Minnesota counties of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Ramsey, Scott, Washington and Wright, and the Wisconsin county of St. Croix. This area is approximately the area within fifty miles of Minneapolis. Defendants assert that the geographic market is considerably larger than the MSP/MSA and includes dairies in Wisconsin, Iowa and North Dakota.

22. Eight local dairies currently supply milk to customers in the MSP/MSA: Marigold, Country Lake, Superior, Oak Grove,

Schroeder, Hastings, Meyer Brothers and Summit.

23. Country Lake and Superior are direct competitors in the MSP/MSA as well as in other parts of Minnesota.

24. Both Country Lake and Superior charge a range of prices to their customers. The volume purchased and type of services received by the purchaser affect the price charged.

25. Major changes in the fluid milk industry during the past 40 years, including the increase in economies of scale in processing plants and faster, cheaper, and safer transportation, have expanded the geographic area that can be economically served by a dairy.

26. Country Lake sells 65.8% of its fluid milk within the MSP/MSA, and 34.2% outside the MSP/MSA. Superior sells 87% of its fluid milk within the MSP/MSA, and 13% outside the MSP/MSA. A comparison of the estimated per capita milk consumption in the MSP/MSA with the total production of the top seven dairies, shows that only 51.4% of the milk processed in the MSP/MSA is consumed there. A comparison of the amount of money received through sales within the MSP/MSA with the total amount of sales of the top eight dairies shows that 69.8% of the milk processed in the MSP/MSA was sold there.[1] When shipping patterns in the MSP/MSA are analyzed by means of the Elzinga–Hogarty Test,[2] the test results support defendants' argument that the relevant geographic market is larger than the eleven-county MSP/MSA.

27. The government obtained declarations from ten dairies outside the MSP/MSA that they would be unlikely to ship substantial volumes of fluid milk into the MSP/MSA in response to a small but significant increase in the price of fluid milk in the MSP/MSA. In eliciting the declarations, the government did not inform the declarants of the current range of prices in the MSP/MSA and did not ascertain whether the dairies knew those prices. In asking the dairies whether they would sell fluid milk in the MSP/MSA, the government did not ask what the dairies would do if their entry was solicited by a purchaser in the MSP/MSA.

28. Dairies outside the MSP/MSA ("distant dairies"[3]) consider transportation costs, higher raw milk prices, difficulties in servicing distant customers well, and the likelihood that local dairies will lower their prices to meet those of distant dairies as disincentives to the sale of fluid milk in the MSP/MSA.

29. Milk processors outside the MSP/MSA and outside Federal Order No. 68 pay a higher price for raw milk. If they ship into the MSP/MSA, some processors may recoup a portion of this cost in credit for over-order premiums paid.

30. At least five dairies within a 350 mile radius from the MSP/MSA have substantially lower labor costs than Country Lake.

31. Some distant dairies could profitably enter the MSP/MSA if there were a small but significant and nontransitory increase in the price of milk there.

32. Three dairies within a 350 mile radius from the MSP/MSA declared they "would not hesitate" to begin selling milk in Minnesota if a Minnesota grocer asked them to sell in substantial quantities over a six month period at prices that would be profitable for them. These three currently have excess capacity that could be utilized for such sales. Two other dairies declared

---

1. Because some of the milk sold within the MSP/MSA was shipped to buyers' warehouses but then shipped to stores outside the area, the percentage amount of sales within the MSP/MSA is overstated.

2. The Elzinga–Hogarty Test measures the accuracy of a market delineation by determining the amount of either imports into or exports from a tentative market. The test is based on the assumption that if an area has significant exports or imports, then that area is not a relevant geographic market. Under the Elzinga–Hogarty Test, exports or imports greater than 10% suggest that the market examined is not a relevant market.

3. The defendants assert that dairies within a 350 mile radius of the MSP/MSA are in the relevant geographical market. These are the dairies referred to as "distant dairies" in this discussion.

they would probably accept firm commitments from new or existing customers in the MSP/MSA at a profitable price. One of these dairies would do so only if no additional capital investment were needed to provide the milk. Another dairy would be likely to enter if there was a nontransitory increase of 7% in the price of fluid milk.

33. If there were a 5% price increase, and given the average range of prices at which Country Lake sells its milk, all its customers purchasing within that price range could find distant dairies which could profitably sell them fluid milk.

34. The influence of fluid milk prices outside the MSP/MSA on the price of fluid milk within the MSP/MSA is demonstrated by evidence that in at least one case a price offer from a dairy outside the MSP/MSA is being met by a dairy within the MSP/MSA.

35. At least five substantial purchasers of fluid milk in the MSP/MSA are sensitive to and carefully monitor changes in fluid milk prices. They believe they would recognize price increases that are not based on normal market conditions. They declared that a substantial increase in milk prices would prompt them to aggressively negotiate a reduction or to seek a substitute or replacement supplier of fluid milk. If competitive prices could not be found within the MSP/MSA, the purchasers would seek supplies from outside dairies.

36. Defendants have shown that buyers within the MSP/MSA can practicably turn to dairies outside the MSP/MSA for fluid milk should a price increase occur based on a cartel among dairies in the MSP/MSA.

37. The government has not shown a probability of success in meeting its burden of defining the MSP/MSA as the relevant geographic market, that is, in showing that the MSP/MSA is the only area to which purchasers could practicably turn for supplies.

38. Marigold, having a market share of approximately 36.4%, is the largest seller of fluid milk in the MSP/MSA. Country Lake is the second largest seller of fluid milk in the area. In 1989, Country Lake's sales in the MSP/MSA were approximately $29.3 million, which amounted to approximately 18.2% of total fluid milk sales in the MSP/MSA. Superior's sales of fluid milk in 1989 were approximately $28.6 million, and its market share was 17.8%. If Country Lake is allowed to acquire the stock of Superior, Country Lake's share of the MSP/MSA would increase to approximately 36 percent, and the top two firms—Marigold and Country Lake—would control approximately 72.4% of total sales in that area.

39. If the Court were to accept the MSP/MSA as the relevant geographical market for analyzing the proposed acquisition, the market for fluid milk sales in the MSP/MSA would appropriately be characterized as highly concentrated. The combined market shares of the top four milk processors ("four-firm concentration ratio") would be approximately 84.1% prior to the proposed acquisition and 90.2% following the acquisition. Applying the Herfindahl–Hirschman Index ("HHI" [4]) to this market, the HHI total prior to acquisition is 2186. Following the acquisition, it is 2832. Under the Justice Department's Merger Guidelines, § 3.11, a market with an HHI exceeding 1800 is characterized as highly concentrated.

40. In spite of the high concentration of existing sellers of fluid milk in the MSP/MSA, the absence of entry barriers makes it unlikely that these sellers of fluid milk could exercise market power. Brand loyalty is an insignificant competitive factor for entry into a fluid milk market. Some distant dairies could profitably enter the MSP/MSA market should a small but significant, non-transitory price increase occur. They are likely to enter if made an

---

**4.** The HHI is a measure of market concentration calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

appropriate offer by a fluid milk purchaser in the market. For some dairies with excess capacity this entry could be quick. Expansion of existing plants to supply milk to a new market can be done relatively cheaply and rapidly. People engaged in the business are aware of this.

41. Competition is ensured in the market by the power of MSP/MSA milk buyers. The major purchasers of fluid milk in the MSP/MSA are large food distributors. The Court accepts the testimony of defendants' expert, Willard F. Mueller, that the food distribution industry in this area is extremely concentrated with the three largest distributors accounting for more than 90% of industry sales. Because of their size and the volume of their purchases, the food distributors possess substantial power over the sellers of fluid milk. They monitor milk prices closely and are generally very sophisticated buyers. They could and would immediately challenge increases in fluid milk prices not related to normal market conditions, and could and would quickly seek milk suppliers outside of the MSP/MSA if their current suppliers attempted to increase their prices. They also have the capability to vertically integrate should milk prices become noncompetitive and other sources not be available.

42. Significant efficiencies will be realized by Country Lake's acquisition of Superior. This acquisition will enable Country Lake to increase its capacity substantially. This will result in lower plant and transportation costs and other savings. At minimum, these efficiencies will enable Country Lake to compete head-to-head with Marigold, the top-selling dairy in the MSP/MSA.

43. This is not an acquisition resulting in one dairy having a significantly larger portion of the MSP/MSA market than any other dairy. Country Lake would be similar in size to the market leader, Marigold. The proposed acquisition will enhance competition by enabling Country Lake to become a lower-cost producer capable of effective competition with the market leader.

44. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

1. Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in part:

> No corporation engaged in commerce shall acquire ... the whole or any part of the stock ... of another corporation engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

■ 2. Fluid milk is a "line of commerce" within the meaning of Section 7 of the Clayton Act. 15 U.S.C. § 18.

3. The government has failed to demonstrate that it is probable that it will sustain its burden of proving its allegation that the MSP/MSA is the relevant "section of the country" within the meaning of Section 7 of the Clayton Act in which the effect of Country Lake's acquisition of Superior on competition in the sale of fluid milk should be assessed.

4. Defendants have shown that buyers within the MSP/MSA can practicably turn to dairies outside the MSP/MSA should a small but significant nontransitory price increase occur based on a cartel among dairies in the MSP/MSA.

■ 5. If the Court were to accept the MSP/MSA as the relevant geographical market, this market would appropriately be characterized as highly concentrated both before and after the proposed acquisition. Under *United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963), this high concentration warrants a presumption that a *prima facie* violation of Section 7 has been established, unless defendants present clear evidence that the proposed acquisition is not likely to have such anticompetitive effects.

■ 6. Even if the Court were to accept the MSP/MSA as the relevant geographical market, it is not probable that the government will succeed on the merits because

defendants have presented clear evidence showing that the proposed acquisition will not substantially lessen competition in the MSP/MSA.

7. Commercial realities constituting clear evidence that MSP/MSA dairies are unlikely to exercise monopolistic market power following the proposed acquisition are: the lack of entry barriers, the potential entry by distant dairies, the power of the fluid milk buyers in the area, the possibility of vertical integration, and efficiencies enabling Country Lake to compete with the market leader in the MSP/MSA.

■ 8. Because the government has not shown it is likely to succeed on the merits of this case, it is not entitled to a presumption of irreparable harm to the public interest. As the likelihood of success on the merits decreases, so does the possibility of irreparable harm.

9. On balance, the lack of probability of success on the merits outweighs the possibility of harm to the public interest.

10. The government has not raised questions so serious and difficult as to call for more deliberate investigation.

11. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

## MEMORANDUM

In deciding to deny the government's motion for preliminary injunction, the Court has carefully considered and applied the standard articulated in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981). Specifically, the Court has considered: (1) the probability of success on the merits; (2) the threat of irreparable harm to the plaintiff if the injunction is not granted; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on others; and (4) the public interest. *Id.* at 113. The Court concludes that a preliminary injunction is not warranted because the balance of factors tips toward the defendants and the Court is not left with questions "so

serious and difficult as to call for more deliberate investigation." *Id.*

■ To establish a violation of Section 7 of the Clayton Act, the government first has the burden of establishing the relevant geographic market. *United States v. Connecticut National Bank,* 418 U.S. 656, 669–70, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974). The government asserts that the MSP/MSA, consisting of eleven counties encompassing the area approximately within fifty miles of Minneapolis, is the area in which a cartel could impose a small but significant and nontransitory increase in the price of fluid milk. The government argues that the MSP/MSA is the relevant geographic market because only dairies in the MSP/MSA currently sell there, and distant dairies do not intend to enter that area and could not do so profitably.

In *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the Supreme Court describes the relevant geographic market—"the area of effective competition"—as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Id.* at 327, 81 S.Ct. at 628. The Court finds that the government has failed to define the "area of effective competition" in terms that reflect the actual dynamics of the fluid milk market.

Based on conversations with representatives of dairies in Wisconsin, Iowa and North Dakota, and on declarations obtained from these dairies, the government asserts that distant dairies are not currently selling in the MSP/MSA and would not sell in the MSP/MSA area even in response to a nontransitory 5 to 10% increase in the price of fluid milk. However, the reliability and relevance of this evidence are questionable. The dairies' declarations about their intent to enter the MSP/MSA and the feasibility of such a move were made without any reference to actual or hypothetical prices beyond the notion of a 5 to 10% price increase. The government did not provide the declarants with such prices and did not determine whether the dairies had knowledge of prices in the MSP/MSA. At least one declarant stated that he answered the

government's question based on an increase in the price of raw milk, not processed. Also, it is unclear whether the nontransitory nature of the price increase was articulated to all the dairies.

The most critical shortcoming in the government's evidence is that it does not adequately account for the market conditions that would exist should a price increase occur based on a cartel among dairies in the MSP/MSA. The hypothetical question the government posed to the dairies focused on whether the dairy would sell fluid milk in the MSP/MSA on its own initiative. The president of Dean Foods Company, William Fischer, declared that Dean would not attempt to sell in the MSP/MSA area without first establishing customers there because of the likelihood of competition from local dairies. Similarly, the president of Wells Dairy Co., Fred D. Wells, stated that it would hesitate to enter the MSP/MSA market because it would expect the local dairies to meet his price. Based on such declarations, the government concluded that distant dairies do not intend to enter the MSP/MSA and therefore are not a part of the relevant geographic market.

Defendants provided persuasive evidence that a cartel-inspired price increase in the MSP/MSA would put distant dairies in the position of being invited to sell in the MSP/MSA to substantial, already-in-place customers. Officers of five substantial purchasers of fluid milk in the MSP/MSA declared they would solicit bids from distant dairies if a nontransitory price increase for fluid milk occurred that was not justified by normal market conditions.[5] Four of the dairies that had indicated to the government that they did not intend to sell in the MSP/MSA submitted second declarations indicating their response to solicitation from buyers in the MSP/MSA. These dairies, and a fifth dairy which had not provided a declaration to the government, stated that a decision to enter the MSP/MSA area would be at least probable, if not enthusiastically pursued, if fluid milk customers in the MSP/MSA approached them and offered firm commitments for purchase of appropriate quantities of fluid milk on profitable terms.[6]

In short, the government understated the size of the relevant geographic market because it did not gather sufficient information addressing the issue of where purchasers could practicably turn for fluid milk in the face of a nontransitory price increase among MSP/MSA dairies. The Department of Justice Merger Guidelines indicate that such information should have been pursued. In the introduction to market definition and measurement, § 2.0, the guidelines state: "it is necessary to evaluate both the probable demand responses of consumers and the probable supply responses of other firms."

The government argues that even if distant dairies desired to sell in the MSP/MSA area, they should not be included in the relevant geographic market because such sales would not be economically feasible. Disincentives faced by distant dairies in selling in the MSP/MSA include shipping costs, higher raw milk prices outside the area regulated by Federal Milk Order 68, difficulties in providing service to distant fluid milk purchasers, and the likelihood of local dairies cutting their prices to meet a competitive threat from the outside.

However, defendants offer evidence that distant dairies have substantially lower labor costs enabling them to provide fluid milk to purchasers in the MSP/MSA at a price profitable to the dairies and competi-

---

**5.** These purchasers stated that they monitor fluid milk prices carefully and are able to identify when changes in those prices are attributable to normal market forces such as a change in the price of raw milk.

**6.** That fluid milk purchasers would be able to meet the needs of distant dairies for a firm commitment over an appropriate time period is demonstrated in the declaration of George St. Germain, general manager of Jerry's Enterpris-

es, Inc. In ¶ 6 of his declaration, St. Germain states that if he were to seek a bid from an out-of-state fluid milk supplier, he "should be able to offer that supplier a variety of incentives, including guaranteeing several full truck loads each day, a supply contract for an extended period of time, and the purchase of other dairy products which the supplying dairy may be able to offer."

tive with a cartel despite transportation costs and higher raw milk prices. The government challenges this conclusion. In Appendix A (under seal) to the government's post-hearing memorandum in support of its motion for a preliminary injunction, the government presents one set of calculations showing that the entry prices[7] at which distant dairies would sell in the MSP/MSA are higher than the current MSP/MSA price for fluid milk plus a 5% increase. However, the MSP/MSA price used by the government for these calculations is the lowest price at which Country Lake currently sells its fluid milk to a high volume customer. Even with the addition of a 5% increase, this price is lower than the average range of prices at which Country Lake currently sells fluid milk. As recommended by defendants' expert, Willard F. Mueller, the Court finds it more appropriate to use an average of the full range of existing prices in making such a calculation. No dairy could stay in business if it charged its lowest price to all its customers. Furthermore, it defies common sense to argue that local dairies would conspire to set their prices at a level lower than the current average range of prices.

Appendix A contains another calculation comparing the entry price of distant dairies with the current average range of prices charged by Country Lake and Superior.[8] These calculations lead to the conclusion that some distant dairies, even without a price increase, can profitably compete in the MSP/MSA. On the basis of this data, the government argues that distant dairies should not be included in the relevant geographic market because they are not currently competing in the MSP/MSA, even though such sales could be profitable. The government urges the Court to conclude that these distant dairies would, therefore, never compete in the MSP/MSA. Again, the government has not distinguished between these dairies' attitudes towards initiating new sales in the MSP/MSA and what defendants have shown those attitudes would be if competition breaks down due to cartel pricing. The Court does not think it inconsistent to find that current competitive conditions would deter distant dairies from initiating sales in the MSP/MSA, but that they would come into the area upon the invitation of fluid milk purchasers in the MSP/MSA.

The government also suggests that the calculations in Appendix A showing that some distant dairies could currently sell milk profitably in the MSP/MSA suggest that barriers to competition exist for which defendants have not accounted. One barrier suggested by the government is the possibility that local dairies will lower their prices to compete with incoming distant dairies. If such is the case, then the government's hypothesized nontransitory price increase will be only transitory at best, and the whole basis for the government's allegation of probable anticompetitive behavior breaks down.

The defendants have offered persuasive evidence that the relevant geographic market is larger than the MSP/MSA because purchasers of fluid milk in the Twin Cities could practicably turn to dairies outside the MSP/MSA should a nontransitory 5 to 10% increase in the price of fluid milk occur.[9] Defendants offer other evidence that the relevant geographic market is larger than the MSP/MSA. The Department of Justice Merger Guidelines, § 2.31, suggest that the shipment patterns of firms are relevant to determining the areas in which they compete for sales. Defendants' expert used the Elzinga–Hogarty Test to analyze the fluid milk shipment patterns in the

7. In declarations elicited by defendants, five distant dairies stated prices at which they could profitably sell in the MSP/MSA.

8. This calculation is a comparison of the dairies' projected entry price and the *current* average price of Country Lake and Superior, and therefore does not show the differential that would exist should a 5% price increase occur.

9. In support of its proposed market, the government also argues that Country Lake and Superior admit that they are direct competitors in the MSP/MSA, and that, in its business plans, Country Lake identifies the MSP/MSA as its market. Again, these assertions do not take into account the dairies to which buyers could turn should a price increase occur based on a cartel among dairies in the MSP/MSA.

MSP/MSA. Professor Mueller concluded that the MSP/MSA was smaller than the relevant geographic market because milk processors in the area export at least 30.2%,[10] if not 48.6%,[11] of the milk produced there.[12] Defendants also presented evidence that in at least one case, prices from a dairy outside the MSP/MSA have influenced prices within the area. While the Court does not think it necessary to pronounce what the larger relevant geographic market would be, defendants have persuasively shown that the government's proposed relevant geographic market is too small.

The Court recognizes that under certain circumstances it could be appropriate to grant a preliminary injunction even when the government has not shown a probability of success in establishing the relevant geographic market. *See, United States v. Aluminum Company of America,* 247 F.Supp. 308, 313 (E.D.Mo.1962), *aff'd,* 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965). To determine whether this would be an appropriate course to take, the Court analyzed whether the government has shown a likelihood of success on the merits should the Court accept its assertion that the relevant geographic market is the MSP/MSA.

The Court is persuaded that if the MSP/MSA were accepted as the relevant geographical market, this market would appropriately be characterized as highly concentrated both before and after the proposed acquisition. This conclusion is supported by a post-acquisition "four-firm concentration ratio" of 90.2%. In *United States v. Philadelphia National Bank,* 374 U.S. 321, 363–66, 83 S.Ct. 1715, 1741–43, 10 L.Ed.2d 915 (1963), the United States Supreme Court found that a merger resulting in control of 30% of the relevant market by a single firm, when the four-firm concentration ratio was 70%, was presumptively illegal under Section 7:

> [W]e think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in the market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Id.* at 363, 83 S.Ct. at 1741. Another measure of market concentration is the Herfindahl–Hirschman Index ("HHI") in which the market share of each competing firm in the market is squared and these numbers are added together. The Justice Department's Merger Guidelines, § 3.11, state that a market with an HHI exceeding 1800 is characterized as highly concentrated. The HHI for the fluid milk market in the MSP/MSA would increase from 2186 to 2832 following the proposed acquisition. The Court finds that if the government established that the MSP/MSA is the relevant geographical market, then, under *Philadelphia National Bank* it would be entitled to a presumption of a *prima facie* violation of Section 7.

However, *Philadelphia National Bank* also holds that the presumption may be rebutted by evidence "clearly showing that the merger is not likely to have such anticompetitive effects." *Id.* The opportunity to make such a showing reflects the intent of Section 7 that "a merger had to be functionally viewed, in the context of its particular industry." *Brown Shoe Co. v. United States,* 370 U.S. 294, 321–22, 82 S.Ct. 1502, 1521–22, 8 L.Ed.2d 510 (1962). The Merger Guidelines, § 3.2, suggest that "market share and market concentration data may ... overstate the likely future

**10.** This figure results from a comparison of the amount of money received through sales within the MSP/MSA with the total amount of sales of the top eight dairies. It is likely that this figure understates the amount of exports because some fluid milk sold within the MSP/MSA is eventually shipped outside the area.

**11.** This figure results from a comparison of the estimated per capita milk consumption in the

MSP/MSA with the total production of the top seven dairies.

**12.** In *F.T.C. v. Southland Corp.,* 471 F.Supp. 1 (D.D.C.1979), the court found the government's asserted geographic market too small. Relevant to that decision was the fact that a dairy sold even 10% of its fluid milk outside the government's asserted market. *Id.* at 2.

significance of a firm or firms in the market." The Court turns, then, to the commercial realities of the fluid milk market in the MSP/MSA to determine whether the HHI calculation is an accurate reflection of market power or if other dynamics would prevent existing fluid milk processors in the MSP/MSA from exerting power in the market by imposing a nontransitory price increase.

Defendants assert three reasons why the proposed acquisition is likely to enhance rather than diminish competition. First, defendants assert that low entry barriers exist, making it unlikely that a price increase could be sustained because new competitors would enter the market and offer lower prices. Fluid milk processors face no significant product differentiation barrier. Therefore, a food distributor could change its supplier of fluid milk without losing sales due to brand loyalty. For distant dairies with existing excess fluid milk capacity, entry into the market would not require capital outlay and could occur within a short amount of time. According to the defendants' expert, expansion of the capacity of existing plants can occur relatively cheaply and rapidly to produce fluid milk for a new market. The government's assertion that entry by distant dairies is speculative and unlikely is unpersuasive given the declarations by milk purchasers that they would readily seek new fluid milk suppliers if price increases beyond normal market conditions occurred, and the declarations by distant dairies that they could and would profitably enter the market in response to appropriate offers by milk purchasers. In *United States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir. 1984), the Second Circuit noted that ease of entry by *potential* competitors was relevant to the conclusion that existing competitors could not successfully achieve a nontransitory price increase. *Id.* at 982–83. The court further observed: "[t]he fact that such entry has not happened more frequently reflects only the existence of competitive, entry-forestalling prices." *Id.* at 983.

The most persuasive argument proffered by defendants to rebut the presumption of violation of Section 7 is the power of the buyers in the MSP/MSA. Defendants contend that this power precludes the exercise of market power by the dairies. The market power of buyers is demonstrated in the declarations of fluid milk purchasers cited *supra* in which they described their swift and aggressive response to a price increase unrelated to normal market conditions as well as their willingness to seek out suppliers who would sell fluid milk at lower prices. Professor Mueller also testified to the extraordinary concentration of food distributors in the MSP/MSA in which three distributors account for more than 90% of industry sales. This concentration gives significant market power to these distributors because no dairy in the MSP/MSA could afford to lose their business which would happen if the dairy imposed a price increase unrelated to normal market conditions. While, as the government points out, a number of the customers of Country Lake and Superior make separate buying decisions and do not purchase fluid milk from a large distributor, the fact remains that in a cartel situation one should look at the market as a whole. The actions of large distributors would have an impact on the market as a whole whether or not a particular grocer purchased from that distributor. In addition, as Professor Mueller explained, in a cartel scenario, individual grocers could easily unite to purchase through a large distributor. As discussed *supra*, substantial buyers of fluid milk in the MSP/MSA can and would turn to distant dairies for supplies should local dairies impose a nontransitory price increase that is not justified by other market factors. The possibility of losing these high volume customers will prevent local dairies from exercising such market power.

Defendants also posit the possibility that large food distributors in the MSP/MSA could vertically integrate into fluid milk processing if they perceive that the market is noncompetitive and they cannot find alternate supplies of fluid milk at competitive prices. Defendants' expert presented data that between 1963 and 1980, the amount of such vertical integration in the United

States increased from 3% to about 25%, and that in the Southeastern states this trend has continued. Professor Mueller testified by declaration that large food distributors have the capital resources to purchase an already existing plant or build a new one. They have an already developed customer base, and can achieve economies of scale by utilizing the entire output of a plant. The government argues that such entry is too speculative and would be too gradual to undermine the effects of supracompetitive pricing. The Court would not find the possibility of vertical integration sufficient of itself to rebut the presumption of market power. Nonetheless, the Court finds credible the declaration by Al Guberud, Vice President of Marketing for Fairway Foods, Inc., that the threat of such integration would be "one of the tools" he would use to negotiate lower prices from milk processors, and that, in the face of price increases of 5% or more, he would recommend to his company that it enter the milk processing business, most likely by acquiring an existing milk processor.

A final reason why defendants assert that the proposed acquisition will enhance rather than hinder competition is the resulting efficiencies that will occur, enabling Country Lake to compete directly with the market leader, Marigold. While the government disputes the extent and uniqueness of these efficiencies, the Court accepts the testimony of the persons involved in the milk processing industry that some efficiencies are achieved by an increase in the volume of production which will occur following Country Lake's acquisition of Superior. The Court finds these efficiencies relevant, not so much as an independent factor justifying the proposed acquisition,[13] but as further evidence that the proposed acquisition will enhance competition. In their declarations, Edward O. Heisler, manager of Gateway Foods of Minneapolis, and George St. Germain, general manager of Jerry's Enterprises, Inc., both stated that competition in the MSP/MSA would benefit by the existence of a second large dairy producer that can directly compete with Marigold because it will have similar resources derived from the benefits of economies of scale.

The Court finds that defendants have made a clear showing that the proposed acquisition will not diminish or threaten competition in the MSP/MSA. Defendants' evidence of ease of entry and potential entry by distant dairies into the MSP/MSA, the power of fluid milk purchasers in the area, and the competitive efficiencies gained by Country Lake if allowed to acquire Superior, demonstrate that competitive factors exist in this market that the HHI does not measure. Efforts by local dairies to impose a small but significant nontransitory price increase on the market for fluid milk would be met by vigorous resistance on the part of substantial fluid milk purchasers in the area. The threat or occurrence of subsequent entry by distant dairies into the MSP/MSA or vertical integration by food distributors is a potent antidote to monopolistic behavior on the part of local dairies. The government, therefore, has not shown a probability of success on the merits, either in establishing the MSP/MSA as the relevant geographic market or in proving that the proposed acquisition is likely to substantially lessen competition in the MSP/MSA.

The Court now balances this factor with the other elements involved in the decision whether to grant a preliminary injunction. The government argues that serious and permanent harm to competition and the public interest will result if the preliminary injunction is denied. The government asserts that competition will be diminished until the suit is resolved, and that adequate relief will be extremely difficult to fashion if the proposed acquisition is allowed to occur now, but is subsequently found unlawful. The Court takes these threats to the public interest seriously, but at the same time, recognizes that the likelihood of irreparable harm lessens as the likelihood of success on the merits decreases. For

---

**13.** According to the Department of Justice Merger Guidelines, § 3.5, a party arguing significant net efficiencies as a primary justification for an acquisition, must prove those efficiencies by clear and convincing evidence.

this reason, the Court did a double analysis of the government's likelihood of success, first analyzing the threshhold establishment of the relevant geographic market and then considering the likelihood of success if the government's proposed relevant geographic market were established. The government's lack of probable success on both these issues significantly lessens the threat of irreparable harm. The government rightly states that diminishment of competition is not in the public interest. However, the public interest is also served by efficient and appropriate antitrust enforcement, which in some cases warrants denial of preliminary injunction motions. These interests are shared by the private parties in this case as well. Weighing these considerations, the Court finds that the balance of these factors tips toward the defendants and against the granting of preliminary relief. The *Dataphase* articulation of the preliminary injunction standard suggests that the Court also ask whether the moving party "has raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase*, 640 F.2d at 113. The Court answers this question in the negative.

The Court therefore denies the government's motion for a preliminary injunction blocking Country Lake's acquisition of Superior.